# United States Court of Appeals
## For the First Circuit

Nos. 07-1482, 07-1483

COMMONWEALTH OF MASSACHUSETTS,

Petitioner,

v.

UNITED STATES; UNITED STATES NUCLEAR REGULATORY COMMISSION,

Respondents,

ENTERGY NUCLEAR OPERATIONS, INC.; ENTERGY NUCLEAR
VERMONT YANKEE LLC; ENTERGY NUCLEAR GENERATION COMPANY,

Intervenors.

ON PETITIONS FOR REVIEW OF ORDERS OF THE
U.S. NUCLEAR REGULATORY COMMISSION

Before
Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

Matthew Brock, Assistant Attorney General, with whom Martha
Coakley, Attorney General, Diane Curran, and Harmon, Curran,
Spielberg & Eisenberg, L.L.P. were on brief for petitioner.
Steven C. Hamrick, Attorney, with whom Karen D. Cyr, General
Counsel, John F. Cordes, Jr., Solicitor, E. Leo Slaggie, Deputy
Solicitor, U.S. Nuclear Regulatory Commission, Ronald J. Tenpas,
Acting Assistant Attorney General, and Lane M. McFadden, Attorney,
U.S. Department of Justice, were on brief for respondents.
David R. Lewis with whom Paul A. Gaukler and Pillsbury
Winthrop Shaw Pittman LLP were on brief for intervenors.

April 8, 2008

**LYNCH, <u>Circuit Judge</u>.** The Commonwealth of Massachusetts wishes to ensure that the United States Nuclear Regulatory Commission ("NRC" or the "Commission") will take account of the Commonwealth's safety concerns about treatment of spent fuel rods before the NRC decides whether to renew the operating licenses of two nuclear energy plants: the Pilgrim plant in Plymouth, Massachusetts, and the Vermont Yankee plant in Vernon, Vermont, which is within ten miles of the Massachusetts border. The licenses were originally issued in 1972 and will expire in 2012; the re-licensing proceedings have been initiated and are ongoing.

The Commonwealth says that old assumptions about safe storage of spent fuel rods -- on which the NRC has relied since at least the early 1970s -- no longer hold. The Commonwealth claims that more recent studies and changed circumstances indicate an increased risk that the plants' method of storing spent fuel rods will lead to an environmental catastrophe. It also raises its concern that the plants' method of storing spent fuel leaves the plants vulnerable to terrorist attack.

Both sides agree that the safety issues raised are deserving of careful consideration. Both sides also agree that the Commonwealth is by law permitted to raise its various concerns by some path and to obtain judicial review of any NRC decision that adversely affects its interests in this matter. The question presented here is whether the Commonwealth has, from the regulatory

maze, chosen the correct path for doing so. The Commonwealth insists it has chosen the appropriate path, indeed, the only one available to it. In short, the Commonwealth argues that it must be allowed to participate directly in the re-licensing proceedings as a party in order to get its safety-based contentions heard. In the alternative, the Commonwealth argues that the NRC must ensure that it resolves a separate rulemaking petition, initiated by the Commonwealth and based on the same concerns about spent fuel storage, before the Commission issues any renewal licenses so that the results of the rulemaking will apply to the Pilgrim and Vermont Yankee re-licensing proceedings.

The NRC says the Commonwealth has chosen the wrong path, indeed, one precluded by its regulations. The agency also says that another option is available, is the proper path to be followed, and will adequately protect the state's interests. According to the NRC, the Commonwealth must abandon its attempt to attain formal "party" status in the licensing proceedings and instead seek to participate in those proceedings as an "interested governmental entity." The Commonwealth may, in that capacity, petition the agency to delay issuance of the renewal licenses until the Commonwealth's request for a rulemaking is resolved. Indeed, the NRC has committed itself in this case to an interpretation of its regulations in such a way as to provide this alternative path,

complete with opportunities for eventual judicial review, to the Commonwealth.

We hold as a matter of law that the Commonwealth has chosen the wrong path in seeking to raise the safety issues as a party in the licensing proceedings and deny its petition. We also bind the NRC to its litigation position, described in more detail below. This leaves the Commonwealth free to follow the NRC's preferred path if it so chooses. To the extent the Commonwealth seeks an order from this court interfering with the NRC's ongoing re-licensing proceedings by imposing decision-making timetables on the agency, we issue a very brief stay but otherwise decline to issue such relief.

I.

Regulatory Background

A description of the regulatory scheme governing the process for renewing licenses to operate nuclear power plants is helpful to understand this case. The Atomic Energy Act ("AEA") contains the statutory basis for issuing and renewing such licenses. See 42 U.S.C. §§ 2133, 2134(b). The AEA empowers the NRC to make licensing decisions. Id. §§ 2133, 2134(b). The AEA provides for initial operating licenses valid for up to forty years and specifies that licenses "may be renewed." Id. § 2133(c).[1] The

---

[1]    Sections 2133 and 2134(b) originally provided separate bases for issuing atomic energy licenses. Unlike § 2133, § 2134(b) does not explicitly impose a forty-year limit or provide for

AEA says nothing more about requirements for re-licensing, instead delegating to the NRC authority to determine applicable rules and regulations. Id. §§ 2133, 2134(b).

The NRC has codified two distinct sets of regulations containing requirements for license renewal applications. The first set of regulations focuses on technical issues such as equipment aging. See, e.g., 10 C.F.R. § 54.4 (defining scope of renewal requirements in 10 C.F.R. Part 54). Those provisions are not at issue here.

The NRC promulgated the other set of regulations, codified at 10 C.F.R. Part 51, primarily to fulfill the agency's obligations under the National Environmental Policy Act ("NEPA"). See 10 C.F.R. § 51.10 (explaining purpose of Part 51 regulations). NEPA requires federal agencies to document the environmental impacts and possible alternatives to proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). In doing so, NEPA fulfills dual purposes. First, it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a

license renewal. However, the agency has treated licenses issued under either provision as subject to the same terms limiting the initial license to no more than forty years and providing for renewal following expiration of the initial license. See Nuclear Power Plant License Renewal, 55 Fed. Reg. 29,043, 29,050 (proposed July 17, 1990); see also 10 C.F.R. § 50.51. Agency regulations now explicitly subject licenses for plants issued under both provisions to the same requirements for renewal. See 10 C.F.R. § 54.1.

proposed action." Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc., 462 U.S. 87, 97 (1983) (quoting Vt. Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc., 435 U.S. 519, 553 (1978)) (internal quotation marks omitted). "Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." Id. (citing Weinberger v. Catholic Action of Haw. Peace Educ. Project, 454 U.S. 139, 143 (1981)).

Issuance or renewal of a license to operate a nuclear power plant is a "major Federal action" triggering NEPA's requirement that the agency produce an Environmental Impact Statement ("EIS") for such proceedings. 10 C.F.R. § 51.20.

Producing an EIS containing adequate discussion of all the environmental issues relevant to licensing the operation of a nuclear power plant poses a significant task for the NRC. In an effort to streamline the license renewal process, the NRC in 1996 conducted a study to determine which NEPA-related issues could be addressed generically (that is, applying to all plants) and which need to be determined on a plant-by-plant basis. The agency characterizes the first group of issues as Category 1, and the second as Category 2, issues. See generally Office of Nuclear Regulatory Research, U.S. Nuclear Regulatory Comm'n, NUREG-1437, 1 Generic Environmental Impact Statement for License Renewal of Nuclear Plants (1996).

Category 1 issues are common to all nuclear power plants, or to a sub-class of plants. As such, the NRC does not analyze generic Category 1 issues afresh with each individual plant operating license application. Instead, the agency conducted an extensive survey and generated findings, contained within a Generic Environmental Impact Statement ("GEIS"), that answer Category 1 issues as to all nuclear power plants. See id. at 1-3 to 1-6. The GEIS findings have since been codified through a rulemaking. See Environmental Review for Renewal of Nuclear Power Plant Operating Licenses, 61 Fed. Reg. 28,467 (June 5, 1996) [hereinafter Final Rule]; see also 10 C.F.R. pt. 51, subpt. A, app. B (listing "NEPA issues for license renewal of nuclear power plants" and assigning them to either Category 1 or 2). Category 2 issues, by contrast, are those non-generic issues that require site-specific analysis for each individual licensing proceeding. 10 C.F.R. pt. 51, subpt. A, app. B, n.2.

These categories affect how the NRC handles the NEPA-mandated EIS requirements. The process of creating the EIS for an operating licensing (or re-licensing) proceeding begins with the applicant, although producing the EIS is ultimately the NRC's responsibility. Under the regulations, each applicant must submit to the agency an environmental report that includes plant-specific analysis of all Category 2 issues. Id. § 51.53(c)(3)(ii). The regulations generally relieve applicants of having to discuss

-7-

Category 1 issues, instead allowing applicants to rest on the GEIS findings.  Id. § 51.53(c)(3)(i).

The regulation does require an applicant's report to include "any new and significant information regarding the environmental impacts of license renewal of which the applicant is aware."  Id. § 51.53(c)(3)(iv).  The NRC concedes that this applies even to "new and significant information" concerning Category 1 issues.

NRC staff then draw upon the applicant's environmental report to produce a draft supplemental EIS ("SEIS") for the license renewal.  See id. § 51.95(c).  This plant-specific SEIS addresses Category 2 issues and complements the GEIS, which covers Category 1 issues.  Id. § 51.71(d).  When the GEIS and SEIS are combined, they cover all issues that NEPA requires be addressed in an EIS for a nuclear power plant license renewal proceeding.

Once the agency has prepared a draft SEIS, it must be made available for comment both to the public and to other federal, state, and local agencies.  Id. §§ 51.73, 51.74.  After receiving comments, the NRC must then prepare a final SEIS.  Id. § 51.95(c)(3) (referencing id. § 51.91).

Because Category 1 issues have already been addressed globally by 10 C.F.R. pt. 51, subpt. A, app. B, they cannot be litigated in individual adjudications, such as license renewal proceedings for individual plants.  See id. § 2.335; Fla. Power &

Light Co. (Turkey Point Nuclear Generating Plant), 54 N.R.C. 3, 12, 20-23 (2001).  Instead, the agency has established other means for challenging GEIS findings regarding Category 1 issues when necessary, whether by the agency's own initiative or by petition from an outside entity.  This divergent treatment of generic and site-specific issues is reasonable and consistent with the purpose of promoting efficiency in handling license renewal decisions.

There are several methods of review of Category 1 issues. First, the agency must review the GEIS findings every ten years. See Final Rule, supra, 61 Fed. Reg. at 28,468.  Second, the NRC staff may make a request to the Commission that a rule be suspended on a generic basis or that a particular adjudication be delayed until the GEIS and accompanying rule are amended.  Id. at 28,470. This would be an appropriate course of action should public comments on a draft SEIS (or information submitted by a license renewal applicant) alert the agency to "new and significant information" calling into question the validity of a GEIS finding. Id.

Third, the NRC staff may request that a rule be suspended with respect to a particular plant if comments to a draft SEIS reveal site-specific information indicating that the rule would be inapplicable to that particular plant.  Id.

Fourth, "[a] party to an adjudicatory proceeding" may petition for a waiver of an NRC rule or regulation with respect to

that proceeding. 10 C.F.R. § 2.335(b). "The sole ground for petition of waiver or exception is that special circumstances with respect to the subject matter of the particular proceeding are such that the application of the rule or regulation . . . would not serve the purposes for which [it] was adopted." Id.

Finally, any member of the public may petition the agency for a rulemaking proceeding aimed at altering the GEIS and its accompanying rule. Final Rule, supra, 61 Fed. Reg. at 28,470.

II.

Administrative Proceedings

Entergy,[2] intervenor to these petitions, obtained operating licenses for the Pilgrim and Vermont Yankee plants in 1972. Those licenses will expire in 2012, but they may be renewed for an additional twenty-year period, which would last until 2032. On January 25, 2006, Entergy submitted applications to begin the license renewal process.[3]

Both the Pilgrim and the Vermont Yankee applications included an environmental report specific to the respective plant. Entergy's environmental reports did not contain in-depth discussion

---

[2] We use "Entergy" to refer to three entities: Entergy Nuclear Generation Company holds the Pilgrim plant possession and use license; Entergy Nuclear Vermont Yankee LLC holds the Vermont Yankee plant possession and use license; and Entergy Nuclear Operations, Inc. holds the operating licenses for both facilities.

[3] The Commission is currently scheduled to issue a decision on the Plymouth application by July 27, 2008 and the Vermont Yankee application by November 2008.

of any Category 1 issues and represented that "Entergy has not identified any new and significant information concerning the impacts addressed by these [GEIS] findings."

On May 26, 2006, the Commonwealth of Massachusetts submitted parallel hearing requests in each of the two plant re-licensing proceedings. Each request included only one contention that the Commonwealth proposed to introduce into the proceedings: that Entergy's environmental reports for each plant did not satisfy NEPA "because [they do] not address the environmental impacts of severe spent fuel pool accidents."

The storage of spent fuel on site at nuclear power plants is a Category 1 issue for operating license renewal purposes.[4] 10 C.F.R. pt. 51, subpt. A, app. B. That subject is normally exempt from discussion in a license renewal applicant's environmental report, id. § 51.53(c)(3)(i), but may be raised elsewhere. The Commonwealth contends that it may raise the issue in the re-licensing proceeding and that Entergy's report violated NEPA and 10 C.F.R. § 51.53(c)(3)(iv) because it failed to address "new and

_____

[4] The regulation adopts the GEIS findings that "[t]he expected increase in the volume of spent fuel from an additional 20 years of operation can be safely accommodated on site with small environmental effects through dry or pool storage at all plants if a permanent repository or monitored retrievable storage is not available." 10 C.F.R. pt. 51, subpt. A, app. B. As such, the license renewal regulations classify the environmental impacts of on-site spent fuel storage as "small," i.e., "not detectable or . . . so minor that they will neither destabilize nor noticeably alter any important attribute of the resource." Id. at n.3.

-11-

significant information" regarding the risks of on-site spent fuel storage.

Spent fuel rods are a radioactive waste product of nuclear power plants. When the Pilgrim and Vermont Yankee plants were originally licensed in 1972, it was common practice to arrange spent fuel rods in low-density racks in water-filled storage pools located at the plant that produced the waste. At the time, there was a national policy of eventually disposing of spent fuel through reprocessing. Long-term storage in a central geologic repository posed another option for removing spent fuel from reactor sites. However, the reprocessing strategy was abandoned in the mid-1970s, and although the federal government has been planning to accept spent fuel at a proposed repository at Yucca Mountain, Nevada, that option will not be available until at least 2015, if at all. As a result, spent fuel has accumulated at on-site storage facilities, and power plant operators have replaced low-density racks with high-density racks in storage pools in order to accommodate the mounting volume of spent fuel rods. According to the Commonwealth, use of high-density racks restricts the flow of cooling fluid around spent fuel rods and raises the risk of fire under a number of scenarios.

The Commonwealth contended in the re-licensing proceedings that new and significant information about on-site spent fuel storage at the Pilgrim and Vermont Yankee plants was

demonstrated by the switch to high-density storage racks, recent scientific studies regarding the dangers of high-density storage pool fires, and the increased likelihood of terrorist attack following September 11, 2001. According to the Commonwealth,

> [s]ignificant new information now firmly establishes that (a) if the water level in a fuel storage pool drops to the point where the tops of the fuel assemblies are uncovered, the fuel will burn, (b) the fuel will burn regardless of its age, (c) the fire will propagate to other assemblies in the pool, and ([d]) the fire may be catastrophic.

A spent fuel pool fire would be catastrophic in large part because "[a] large, atmospheric release of radioactive material would occur."

The Commonwealth appended four reports to its hearing requests in support of its pool fire contention. The first two resulted from studies commissioned by the Commonwealth to assess the risks of and alternatives to on-site, high-density pool storage at the Pilgrim and Vermont Yankee plants. The first of these was written by Dr. Gordon R. Thompson of the Institute for Resource and Security Studies in Cambridge, Massachusetts. The Thompson report surveyed analyses by NRC staff and others and found that they recognized that "a loss of water from . . . high-density, closed-form storage racks would, over a range of scenarios, lead to self-ignition" of a fire "that could propagate across the pool." The report assessed the probability of a high-density storage pool fire occurring at either Pilgrim or Vermont Yankee as at least one per

-13-

10,000 years.  Dr. Thompson recommended replacing the high-density storage racks at both facilities with low-density, open-frame racks.  This course would, according to Dr. Thompson, "return the plant[s] to [their] original design configuration" and "achieve the largest risk reduction[] during plant operation within a license extension period."  Dr. Thompson also surmised that re-equipping the plants with the recommended racks would cost less than $110 million for each plant.

The second study commissioned by the Commonwealth was authored by Dr. Jan Beyea, a nuclear physicist affiliated with Consulting in the Public Interest, and focused on the consequences of a hypothetical pool fire at the Pilgrim or Vermont Yankee plants.  Under a scenario in which ten percent of the radioactive material in storage at the plants was released into the atmosphere due to a pool fire, Dr. Beyea estimated economic costs of $105-171 billion for Pilgrim, and $87-165 billion for Vermont Yankee.  If one hundred percent of the radioactive material were released in such a fire, the costs would rise to $342-488 billion at Pilgrim and $364-518 billion at Vermont Yankee.  Dr. Beyea estimated that a one hundred percent release of radioactive material at either plant could result in up to 8,000 cases of latent cancer.  Dr. Beyea's report further concluded that the results of recent epidemiologic studies could significantly inflate his estimates of the economic and health costs of a pool fire.

-14-

The third report submitted by the Commonwealth with its hearing requests was authored by NRC staff to assess the risk of spent fuel pool accidents at decommissioned nuclear power plants. Published publicly in early 2001, the report acknowledged the possibility that even a partial loss of cooling fluid in a storage pool could result in a fire. The report also observed that because "fuel assembly geometry and rack configuration are plant specific," the possibility of pool fires "cannot be precluded on a generic basis." However, the report also concluded that "even though the consequences from a zirconium fire could be serious," the risk of such fires at decommissioning plants "is low and well within the Commission's safety goals."

Finally, the Commonwealth submitted a report produced, at the request of Congress, by the National Academy of Sciences to examine the potential consequences of a terrorist attack on spent fuel storage facilities sited at nuclear power plants. The report concluded that while all plants should have on-site pools for storage of spent fuel, there is some risk that a terrorist attack could partially or fully drain such a pool, leading to a fire and the release of radioactive material. The report also concluded that "[t]he potential vulnerabilities of spent fuel pools to terrorist attacks are plant-design specific. Therefore, specific vulnerabilities can be understood only by examining the characteristics of spent fuel storage at each plant."

-15-

The NRC convened two Atomic Safety and Licensing Boards ("ASLB" or "Board") to assess whether the various contentions submitted by the Commonwealth and other entities were admissible in the Pilgrim and Vermont Yankee license renewal proceedings. On June 22, 2006, Entergy and the NRC staff filed oppositions to the Commonwealth's hearing requests, arguing the Commonwealth had chosen the wrong path to raise its contentions. They asserted the Commonwealth had impermissibly challenged a generic Category 1 issue without requesting a waiver of the agency's rule within the Pilgrim and Vermont Yankee proceedings. They also argued that the information submitted by the Commonwealth did not constitute "new and significant" information within the meaning of 10 C.F.R. § 51.53(c)(3)(iv). During oral arguments at pre-hearing conferences in front of the ASLBs, the Commonwealth staked out its position that the waiver provision was unavailable in any event; it could not seek waiver in the individual proceedings because its contention regarding pool fires was not specific to either of the two plants, but was a safety issue common to all plants.

The Commonwealth also informed the ASLBs of its intention to file a rulemaking petition aimed at modifying the GEIS findings about on-site spent fuel storage. The parties agree that this rulemaking path is and always has been open to the Commonwealth.

On August 25, 2006, following oral arguments in front of the Pilgrim and Vermont Yankee ASLBs, the Commonwealth filed a

-16-

petition for rulemaking with the NRC based on the same pool fire contention raised in its hearing requests in the individual licensing proceedings.[5]  The petition requested that the NRC

> (a) consider new and significant information showing that the NRC's characterization of the environmental impacts of spent fuel storage as insignificant in the 1996 [GEIS] is incorrect, (b) revoke the regulations which codify that incorrect conclusion and excuse consideration of spent fuel storage impacts in NEPA decision-making documents, (c) issue a generic determination that the environmental impacts of high-density pool storage of spent fuel are significant, and (d) order that any NRC licensing decision that approves high-density pool storage of spent fuel at a nuclear power plant . . . must be accompanied by an [EIS] that addresses (i) the environmental impacts of high-density pool storage of spent fuel at that nuclear plant and (ii) a reasonable array of alternatives for avoiding or mitigating those impacts.

The petition also urged the NRC to "withhold any decision to renew the operating licenses for the Pilgrim and Vermont Yankee nuclear power plants until the requested rulemaking has been completed" and suspend consideration of the Commonwealth's contentions in the individual proceedings.  In support of its petition, the Commonwealth appended the same four reports described above.  To date, there has been no decision on the rulemaking petition, and

_____

[5]    The State of California has submitted a petition for rulemaking raising similar concerns; the NRC is currently considering both petitions. See State of California; Receipt of Petition for Rulemaking, 72 Fed. Reg. 27,068 (proposed May 14, 2007); Mass. Attorney Gen.; Receipt of Petition for Rulemaking, 71 Fed. Reg. 64,169 (proposed Nov. 1, 2006).

the issue before us does not involve that petition, but rather the Commonwealth's hearing requests in the individual plant re-licensing proceedings.

The Vermont Yankee ASLB issued its decision on the hearing requests in that proceeding on September 22, 2006. Entergy Nuclear Vt. Yankee, LLC (Vt. Yankee Nuclear Power Station) (Vt. Yankee I), 64 N.R.C. 131 (2006). As an initial matter, the ASLB granted standing to the Commonwealth. Id. at 145. The Board went on to reject the Commonwealth's contention, ruling that even if the Commonwealth's contention presented "new and significant information" about pool fires, "as a matter of law the contention is not admissible because the Commission has already decided, in Turkey Point, that licensing boards cannot admit an environmental contention regarding a Category 1 issue." Id. at 155. The Board stated the agency's position that under 10 C.F.R. § 51.53(c)(3), a licensing applicant such as Entergy must provide analysis of new and significant information regarding a NEPA issue, whether Category 1 or 2, in its environmental report. Id. Further, the Board observed that "if the information that the [Commonwealth] presents is indeed new and significant, the Staff's SEIS needs to address it." Id. at 156.

The Board's ruling did not purport to foreclose any challenge by the Commonwealth to the agency's rule on on-site spent fuel storage. Again citing Turkey Point, the Board pointed out

-18-

that the Commonwealth "has several options, including filing a petition for rulemaking, providing the information to the NRC Staff (which can then seek Commission approval to suspend the application of the rules or delay the license renewal proceeding), or petitioning the Commission to waive the application of the rule." Id. at 159. The Board concluded its discussion of the Commonwealth's contention by noting the Commonwealth's pending rulemaking petition. "Thus we see," the Board stated, "that the [Commonwealth] has already begun to pursue the alternative remedies specified in Turkey Point." Id. at 161.

On October 16, 2006, the Pilgrim ASLB issued a ruling rejecting the Commonwealth's pool fire contention on substantially the same grounds as had the Vermont Yankee ASLB. Entergy Nuclear Generation Co. (Pilgrim Nuclear Power Station), 64 N.R.C. 257, 294-300 (2006).

The Commonwealth appealed the ASLB decisions to the NRC. The Commission affirmed the Pilgrim and Vermont Yankee ASLB decisions on January 22, 2007. Entergy Nuclear Vt. Yankee, LLC (Vt. Yankee Nuclear Power Station) (Vt. Yankee II), 65 N.R.C. 13 (2007). The NRC agreed with the ASLBs that the Commonwealth "chose the appropriate way to challenge the GEIS when [it] filed [its] rulemaking petition." Id. at 20. The Commission explained that "[i]t makes more sense for the NRC to study whether, as a technical matter, the agency should modify its requirements relating to spent

-19-

fuel storage for all plants across the board than to litigate in particular adjudications whether generic findings in the GEIS are impeached by . . . claims of new information."  Id. at 20-21. Otherwise, plant-by-plant litigation of Category 1 issues "would defeat the purpose of resolving generic issues in a GEIS."  Id. at 21.

The Commission's decision also described how the pending rulemaking could affect the Pilgrim and Vermont Yankee licensing proceedings.  The Commission rejected the Commonwealth's request that it suspend the licensing proceedings.  It would be "premature" to delay a final decision on licensing, the Commission reasoned, where "final decisions in those proceedings are not expected for another year or more" and "involve many issues unrelated to the [Commonwealth's] rulemaking petition."  Id. at 22 n.37.  However, "depending on the timing and outcome" of the rulemaking, the Commission recognized the possibility that NRC staff could request that the Commission suspend the generic rule and include plant-specific analysis of pool storage in the Pilgrim and Vermont Yankee SEISs.  Id. at 22.  We are told that to date, that has not happened.

The Commission also outlined a route by which the Commonwealth itself could influence the timing of the licensing decisions:

> NRC regulations provide that a petitioner who has filed a petition for rulemaking "may

> request the Commission to suspend all or any part of any licensing proceeding to which the petitioner is a party pending disposition of the petition for rulemaking." 10 C.F.R. § 2.802(d). An interested governmental entity participating under 10 C.F.R. § 2.315 could also make this request.

Id. at 22 n.37. Because alternatives were available, "admitting the [Commonwealth's] contention for an adjudicatory hearing is not necessary to ensure that the claim receives a full and fair airing." Id. at 22.

The Commonwealth filed a motion for reconsideration and clarification on February 1, 2007. The Commonwealth requested that the Commission

> establish that: (a) [Vt. Yankee II] is not a final decision with respect to the [Commonwealth's] rights of participation in the Pilgrim and Vermont Yankee license renewal proceedings, (b) the Commission will treat the [Commonwealth] as a party if the [Commonwealth] later decides to seek to suspend the license renewal decisions for [the plants] under 10 C.F.R. § 2.802, and (c) as a party, the [Commonwealth] would be permitted to seek judicial review of any decision by the NRC that fails to make timely application of the results of the proceeding on the [Commonwealth's] petition for rulemaking to the individual license renewal decisions for Pilgrim and Vermont Yankee.

The Commission denied the motion on March 15, 2007. Entergy Nuclear Vt. Yankee, LLC (Vt. Yankee Nuclear Power Station) (Vt. Yankee III), 65 N.R.C. 211 (2007). The Commission found that the motion failed to demonstrate "compelling circumstances"

-21-

justifying reconsideration.  <u>Id.</u> at 214.  The Commission clarified that its previous decision constituted a final decision with regards to the NRC's rejection of the Commonwealth's contentions in the licensing proceedings.  The Commission also pointed out that the Commonwealth, after the NRC's decision of the rulemaking petition, could eventually also obtain judicial review of that decision.  <u>Id.</u> at 214 & n.13.  Finally, the Commission made clear that the Commonwealth "could seek [interested governmental entity] status even now," a maneuver that would allow the Commonwealth to request a stay of the licensing proceedings under 10 C.F.R. § 2.802(d).  <u>Id.</u> at 214-15 & n.16.

The Commonwealth petitioned this court for review of the Commission's decisions.

### III.

The Commonwealth's principal argument in these petitions is that by refusing to take into account its alleged new and significant information regarding pool fires in the Pilgrim and Vermont Yankee license renewal proceedings, whether by admitting the Commonwealth as a party to the licensing proceedings or by promising to apply the results of the rulemaking to those proceedings, the NRC violated NEPA and the Administrative Procedure Act ("APA").

The NRC and Entergy respond that the Commonwealth's NEPA and APA claims are not properly before this court.  Both of these

-22-

parties assert that the agency's ruling in <u>Vt. Yankee II</u> that it had not suspended the licensing proceedings is not yet ripe for judicial review because there has been no final agency action on either the rulemaking petition or the license renewal applications. Entergy further argues that we may not review the NEPA and APA claims because the Commonwealth failed to exhaust available administrative remedies.

A.  NRC Decisions

  The Administrative Procedure Act authorizes this court to displace the Commission's decisions only to the extent that they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); <u>Massachusetts</u> v. <u>U.S. Nuclear Regulatory Comm'n</u>, 878 F.2d 1516, 1522 (1st Cir. 1989). This general posture of deference toward agency decision-making is particularly marked with regards to NRC actions because "[t]he [AEA] is hallmarked by the amount of discretion granted the Commission in working to achieve the statute's ends." <u>Massachusetts</u>, 878 F.2d at 1523 (quoting <u>Pub. Serv. Co. of N.H.</u> v. <u>U.S. Nuclear Regulatory Comm'n</u>, 582 F.2d 77, 82 (1st Cir. 1978)). This principle is applicable in the context of licensing decisions, where statutory directives are scant and the AEA explicitly delegates broad authority to the agency to promulgate rules and regulations. <u>See, e.g.,</u> 42 U.S.C. §§ 2133, 2134(b).

This court must also be mindful of the substantial deference required when an agency adopts reasonable interpretations of regulations of its own creation. Fed. Express Corp. v. Holowecki, 128 S. Ct. 1147, 1155 (2008); Auer v. Robbins, 519 U.S. 452, 461 (1997). We must accept the agency's position unless it is "plainly erroneous or inconsistent with the regulation." Auer, 519 U.S. at 461 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989)) (internal quotation marks omitted).

The Commission's decision to deny party status to the Commonwealth in the Pilgrim and Vermont Yankee license renewal proceedings is reasonable in context, and consistent with agency rules. As the Commonwealth has conceded, the pool fire contention it raised in its hearing requests does not apply solely to the Pilgrim or Vermont Yankee plants and instead challenges a Category 1 GEIS finding.

Where environmental impacts of an NRC action are not plant-specific, the Supreme Court has endorsed "[t]he generic method . . . [as] clearly an appropriate method of conducting the hard look required by NEPA." Balt. Gas & Elec. Co., 462 U.S. at 101 (citing Vt. Yankee, 435 U.S. at 535 n.13). "Administrative efficiency and consistency of decision are both furthered by a generic determination of these effects without needless repetition of the litigation in individual proceedings, which are subject to review by the Commission in any event." Id.

The NRC's procedural rules are clear: generic Category 1 issues cannot be litigated in individual licensing adjudications without a waiver. 10 C.F.R. § 2.335; see also Dominion Nuclear Conn., Inc. (Millstone Nuclear Power Station), 54 N.R.C. 349, 364 (2001); Turkey Point, 54 N.R.C. at 12; Duke Energy Corp. (Oconee Nuclear Station), 49 N.R.C. 328, 343 (1999). If the Commonwealth or any citizen wishes to attack the agency's rule on such an issue, it must petition for a generic rulemaking. Turkey Point, 54 N.R.C. at 12.

NEPA does impose a requirement that the NRC consider any new and significant information regarding environmental impacts before renewing a nuclear power plant's operating license. However, "NEPA does not require agencies to adopt any particular internal decisionmaking structure." Balt. Gas & Elec. Co., 462 U.S. at 100. Here, the NRC procedures anticipate a situation, such as that alleged here by the Commonwealth, in which a generic finding adopted by agency rule may have become obsolete. In such a situation, the regulations provide channels through which the agency's expert staff may receive new and significant information, namely from a license renewal applicant's environmental report or from public comments on a draft SEIS, and the NRC staff may seek modification of a generic Category 1 finding.

The Commonwealth has already chosen the available option of a rulemaking petition. But the rulemaking petition may not move

quickly enough to address the Commonwealth's safety concerns before the Commission renders re-licensing decisions regarding the Pilgrim and Vermont Yankee plants.

The Commonwealth argues that the NRC acted arbitrarily and capriciously when it channeled the Commonwealth's pool fire concerns into a generic rulemaking without any assurances that the result of the rulemaking would apply to the individual licensing proceedings for the Pilgrim and Vermont Yankee plants. Central to the Commonwealth's argument is its assumption that "[u]nder the NRC's present process, the Commonwealth does not even have a right to request the agency to exercise its discretion to stay the individual proceedings so that the results of the rulemaking may be applied to Pilgrim and Vermont Yankee." Pet'r Br. 35.

The Commonwealth's concern is apparently based on a misreading of the NRC's position. Both in its decisions in the administrative proceedings and before this court, the NRC has outlined at least one path by which the Commonwealth may establish a connection between the rulemaking and the licensing proceedings. That path consists of two stages. First, the Commonwealth may participate in the licensing proceedings not as a party with its own contentions, but as an interested governmental body under 10 C.F.R. § 2.315(c).[6] Second, in the rulemaking proceedings, the

---

[6] That regulation states that the officer presiding over a licensing proceeding

-26-

Commonwealth may invoke 10 C.F.R. § 2.802(d), which provides that a rulemaking petitioner "may request the Commission to suspend all or any part of any licensing proceeding to which the petitioner is a party pending disposition of the petition for rulemaking." This stay procedure would, the agency argues, allow the Commonwealth an opportunity to influence the order and timing of the agency's final decisions in the rulemaking and licensing proceedings. But, since the Commonwealth has as yet done neither of those things, there is no final order and those issues are premature.

<hr />

> will afford an interested State, local governmental body . . . and affected, Federally-recognized Indian Tribe, which has not been admitted as a party under [10 C.F.R.] § 2.309, a reasonable opportunity to participate in a hearing. Each State [and] local governmental body . . . shall, in its request to participate in a hearing, each designate a single representative for the hearing. The representative shall be permitted to introduce evidence, interrogate witnesses where cross-examination by the parties is permitted, advise the Commission without requiring the representative to take a position with respect to the issue, file proposed findings in those proceedings where findings are permitted, and petition for review by the Commission under § 2.341 with respect to the admitted contentions. The representative shall identify those contentions on which it will participate in advance of any hearing held.

10 C.F.R. § 2.315(c). The regulation echoes a provision of the AEA that requires the NRC to "afford reasonable opportunity" for state representatives to participate in licensing proceedings. 42 U.S.C. § 2021(l).

The Commonwealth asserts the agency is changing positions before this court regarding the availability of the § 2.802(d) mechanism. Again, we think this is based on a misunderstanding. The Commonwealth quotes a passage from the NRC's denial of the motion for reconsideration: "[U]nder NRC regulations, the [Commonwealth] currently has no right to request that the final decisions in the Pilgrim and Vermont Yankee license renewal proceedings be stayed until the rulemaking is resolved." Pet'r Br. 36 (quoting Vt. Yankee III, 65 N.R.C. at 214) (internal quotation marks omitted). The Commission's decision goes on to explain, however, that the Commonwealth could not "currently" request a stay under § 2.802(d) because at the time of the NRC's decision, the Commonwealth had neither been admitted as a "party" to the licensing proceedings nor asserted interested governmental entity status under § 2.315.[7] Vt. Yankee III, 65 N.R.C. at 214-15. The Commission further represented that the Commonwealth could attain

---

[7] Agency procedure precludes a state from participating in a single proceeding as both a party with an admitted contention and an interested governmental entity. 10 C.F.R. § 2.315(c); La. Energy Servs., L.P. (Nat'l Enrichment Facility), 60 N.R.C. 619, 626-27 (2004). The Commonwealth could thus not participate under § 2.315(c) until the NRC disposed of the Commonwealth's hearing requests. Because the NRC has refused the Commonwealth party status in a decision that is "final" as to those hearing requests, and we deny the Commonwealth's petition, the path has been cleared for the Commonwealth to seek interested governmental entity status, if it so chooses. See Vt. Yankee III, 65 N.R.C. at 214-15 & n.16.

interested governmental entity status "even now."  Id. at 215
n.16.[8]

The Commonwealth seizes upon a textual mismatch in the
regulations to argue that an "interested State" participating in a
licensing proceeding under § 2.315(c) is distinct from a "party,"
and therefore could not invoke the § 2.802(d) procedure.  Compare
10 C.F.R. § 2.315(c) (making participant status available to a
governmental body "which has not been admitted as a party") with
id. § 2.802(d) (allowing petitioner in pending rulemaking to
request suspension of a licensing proceeding "to which the
petitioner is a party").

While we recognize what may be tension between the
wording of these two regulations, we decline to adopt the
Commonwealth's preclusive reading of the term "party" in the face
of a contrary and reasonable reading by the agency.  Dispositive
here is the agency's own reasonable reading of the term, which
treats an interested governmental entity as the equivalent of a
"party" for purposes of § 2.802(d).  "Party" can both be defined in
one context as a term of art, e.g., as one who has demonstrated
standing and whose contention has been admitted for hearing in a

---

[8]     The NRC has represented to this court that even though
the Pilgrim and Vermont Yankee proceedings have continued since the
Commission's decision dated March 15, 2007, the Commonwealth may
still attain interested governmental entity status and avail itself
of the § 2.802(d) stay procedure.  We consider the NRC to be bound
by this representation.

-29-

licensing adjudication, see 10 C.F.R. § 2.309(a), and deployed in its more general sense of one who participates in a proceeding or transaction, see Webster's Third New International Dictionary 1648 (1993) (defining "party" to include one who "takes part with others in an action or affair" or an individual "involved in the case at hand").  The NRC has not defined the term "party" uniformly throughout its regulations. See, e.g., 10 C.F.R. § 2.4 (containing regulatory "Definitions," but not including one for "party"). We must pay deference to this agency's interpretation of its own regulations. Auer, 519 U.S. at 461.

The Commonwealth charges that the NRC has adopted this interpretation for the first time before this court "[i]n an effort to avoid judicial review." Pet'r Supplemental Reply Br. 5. This is not a mere litigation position.  The Commission explicitly stated in its January 22, 2007 affirmance of the ASLB rulings that an interested governmental entity participating under § 2.315(c) could request a suspension under § 2.802(d). Vt. Yankee II, 65 N.R.C. at 22 n.37.  We thus take the NRC's proffered reading of how § 2.315(c) and § 2.802(d) interact to be consistent with the agency's practice generally, as well as its litigation position in this court.

In sum, the NRC acted reasonably when it invoked a well-established agency rule to reject the Commonwealth's requests to participate as a party in individual re-licensing proceedings to

-30-

raise generic safety concerns and required that the Commonwealth present its concerns in a rulemaking petition. The agency is also within the bounds of its authority to interpret its regulations to afford the Commonwealth an opportunity to participate in the Pilgrim and Vermont Yankee licensing proceedings under § 2.315(c) and thereby qualify to request a suspension of those proceedings under § 2.802(d). We note, however, that these conclusions rely on our deference to the agency's interpretations of its own regulations. By staking its position regarding procedural avenues available to the Commonwealth in this case, both in its administrative decisions and in its representations before this court, the agency has, in our view, bound itself to honor those interpretations. See New Hampshire v. Maine, 532 U.S. 742, 749-51 (2001). Further, if the agency were to act contrary to these representations in this matter, a reviewing court would most likely consider such actions to be arbitrary and capricious.

Timing is a factor in this case. Section 2.315(c) affords interested states an opportunity to participate in licensing hearings, but the agency has not stayed the Pilgrim and Vermont Yankee proceedings pending the outcome of this court's decision, and the hearing schedule in at least the Pilgrim proceedings may be coming rapidly to a close. We therefore stay the close of hearings in both plant license renewal proceedings for

-31-

fourteen days from the date of issuance of mandate in this case[9] in order to afford the Commonwealth an opportunity to request participant status under 10 C.F.R. § 2.315(c), should it desire to do so.

What remains is the Commonwealth's objection that accepting the NRC's recommended procedural vehicle subjects the Commonwealth's rights under NEPA to "the NRC's unfettered discretion to grant or withhold" a stay of the licensing proceedings. Pet'r Br. 36. Again, although NEPA does impose an obligation on the NRC to consider environmental impacts of the Pilgrim and Vermont Yankee license renewal before issuing a final decision, the statute does not mandate how the agency must fulfill that obligation. See 42 U.S.C. § 4332; Balt. Gas & Elec. Co., 462 U.S. at 100-01; Vt. Yankee, 435 U.S. at 548. Beyond "the statutory minima" imposed by NEPA, Vt. Yankee, 435 U.S. at 548, the implementing procedures are committed to the agency's judgment. In theory, what fetters the agency's decision-making process and ensures ultimate compliance with NEPA is judicial review. The NRC does not take the position that the Commonwealth is not entitled to judicial review in the future. We turn next to the question of

---

[9]     Action by this court was held in abeyance from December 6, 2007 to February 14, 2008 in order to afford the parties an opportunity to settle. A settlement was not reached, but the Commonwealth's opportunity to avail itself of the NRC's procedural mechanisms to participate in the Pilgrim and Vermont Yankee proceedings should not be prejudiced by the delay in securing a decision from this court.

-32-

whether a meaningful opportunity to seek judicial review would be available to the Commonwealth should it pursue the procedural course advanced by the agency.

B.         Availability of Judicial Review

The NRC and Entergy point out two routes by which the Commonwealth can obtain judicial review of the agency's ultimate treatment of its concerns involving spent fuel pool fires. The first is direct review of the results of the now-pending rulemaking petition; the second is review of a hypothetical Commission denial of a § 2.802(d) stay request, should the Commonwealth pursue that route.[10]

The question of the availability of judicial review upon the occurrence of contingent hypothetical events is not before us and we do not give advisory opinions. It suffices to say that the Commonwealth's argument is not proven that this proceeding must not be dismissed because it is the Commonwealth's one and only path for review of the agency's ultimate resolution of the Commonwealth's pool fire concerns. We doubt the Commonwealth will wish to push

---

[10]     The NRC also suggests that in the event that the agency issues the Pilgrim and/or Vermont Yankee renewal licenses before concluding the pending rulemaking, the Commonwealth could petition this court for a writ of mandamus under 28 U.S.C. § 1651 to compel a final decision from the agency. Because more conventional avenues to judicial review exist, we do not consider here whether and under what circumstances this "extraordinary remedy" would be available to the Commonwealth. Telecomms. Research & Action Ctr. v. FCC, 750 F.2d 70, 78 (1984); accord In re City of Fall River, 470 F.3d 30, 32 (1st Cir. 2006).

this argument in the future, and we see no reason why it cannot change its position. We do offer a few comments to explain our conclusion.

The Hobbs Act provides the jurisdictional basis for federal court review of NRC actions. See 28 U.S.C. §§ 2342(4), 2344. Section 2344 provides that "[a]ny party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies." Id. § 2344. The statute embodies two threshold requirements for a court to assert jurisdiction to review an NRC action. A petitioner must first qualify as a "party aggrieved" under the statute in order to have standing to appeal. Clark & Reid Co. v. United States, 804 F.2d 3, 5 (1st Cir. 1986). There must also be a "final order" for the court to review. 28 U.S.C. §§ 2342(2), 2344; see generally Bennett v. Spear, 520 U.S. 154, 177-78 (1997); Massachusetts, 878 F.2d at 1519-20.

This court applies a functional test to determine whether one is a "party aggrieved" for Hobbs Act purposes. That test asks whether the would-be petitioner "directly and actually participated in the administrative proceedings." Clark & Reid Co., 804 F.2d at 5. Because "we do not equate the regulatory definition of a 'party' in an [agency] proceeding with the participatory party status required for judicial review," id. at 6, it matters not here

whether NRC regulations label the Commonwealth as a "party" or an "interested governmental entity."

C.      Commonwealth's NEPA and APA Claims

The Commonwealth makes a claim for immediate injunctive relief from claimed statutory violations by the NRC.[11]  The NRC and Entergy are correct that the Commonwealth's claims that the agency violated the NEPA and the APA by failing to consider the pool fire contention, regardless of the path followed, is not reviewable at this time.

The Commonwealth's claim that the agency committed statutory violations by rejecting its hearing request fails because it does not meet the basic prerequisite that a petitioner for judicial review of an agency action first exhaust administrative remedies.  P.R. Assoc. of Physical Med. & Rehab., Inc. v. United States, ___ F.3d ___, 2008 WL 787972, at *2 (1st Cir. Mar. 26, 2008) (citing Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41,

---

[11]      Specifically, the Commonwealth requests that this court direct the agency to

> withhold any final decision in the individual license renewal proceedings for Pilgrim and Vermont Yankee unless and until the Commission considers and rules upon the Commonwealth's new and significant information in accordance with NEPA and the AEA and any further rulings by the Court, and the Commission applies those considerations and rulings to the individual Pilgrim and Vermont Yankee relicensing proceedings.

Pet'r Br. 43.

50-51 (1938)); see also 33 Wright & Koch, Federal Practice & Procedure: Judicial Review § 8398, at 397 (2006). The administrative exhaustion requirement gives agencies "a fair and full opportunity" to adjudicate claims presented to them by requiring that litigants use "all steps that the agency holds out, and do[] so properly (so that the agency addresses the issues on the merits)." Woodford v. Ngo, 126 S. Ct. 2378, 2385 (2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)) (internal quotation mark omitted). Otherwise, court review might interrupt the administrative process, impinge on the discretionary authority granted to the agency by the legislature, and squander judicial resources where continued administrative proceedings might resolve the dispute in the petitioner's favor. McKart v. United States, 395 U.S. 185, 193-95 (1969). Those concerns are involved here.

The Commonwealth argues that when the NRC dismissed it from the license renewal proceedings without addressing the NEPA claims, the NRC "conclusively established the Commonwealth's rights and . . . eliminate[d] the Commonwealth's right to challenge the agency's compliance with NEPA . . . ." Pet'r Reply Br. 6. The availability of interested state status under § 2.315(c) and the request for suspension mechanism in § 2.802(d) undermine that position. There has not yet been such a conclusive order. We cannot at this point in the administrative proceedings predict how

the agency would respond on the merits to a § 2.802(d) request from the Commonwealth, let alone evaluate the agency's ultimate compliance with NEPA should the Commonwealth follow that procedure.

The Commonwealth argues separately that the NRC violated NEPA and acted arbitrarily and capriciously when it refused to ensure that the results of the rulemaking would apply to the Pilgrim and Vermont Yankee licensing proceedings. This argument merely repackages the Commonwealth's claims regarding its dismissal from the licensing proceedings and recasts them in the context of its rulemaking petition. We cannot review the NRC's treatment of that petition, however, because the agency has not issued a final order regarding the rulemaking petition.

The NRC decision which the Commonwealth attempts to construe as a "final" refusal to tie the results of the rulemaking back into the individual proceedings was no such thing; it was a "final order" only insofar as it affirmed the agency's dismissal of the Commonwealth's hearing requests in the re-licensing proceedings. See Vt. Yankee III, 65 N.R.C. at 214. Further, by their express language, the Commission's decisions did not purport to rule out a possible future order suspending the Pilgrim and Vermont Yankee proceedings. The Commission merely observed that it would be "premature to consider" such action at a time when there were other, unrelated issues involved in the licensing proceedings that would require significant time to resolve. Vt. Yankee II, 65

-37-

N.R.C. at 22 n.37.   The NRC's statements about the rulemaking within its decisions to dismiss the Commonwealth's hearing requests are "merely tentative" and do not determine any legal rights or consequences.   See Bennett, 520 U.S. at 177-78.

The petitions for review are denied.   No costs are awarded.