**STATE of Alaska, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Trans Alaska Pipeline System (TAPS Carriers), Petro Star Inc., Intervenors.

No. 90–1599.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 9, 1992.

Decided Dec. 11, 1992.

As Amended Dec. 11, 1992.

Robert H. Loeffler, Washington, D.C., argued the cause for petitioner. With him on the briefs were Charles E. Cole, Atty. Gen., Fairbanks, Alaska, W. Stephen Smith, Ellen E. Deason, and Micki M. Chen, Washington, D.C.

Jill Hall, Atty., F.E.R.C., Washington, D.C., argued the cause for respondent. With her on the brief were William S. Scherman, Gen. Counsel, and Jerome M. Feit, Sol., Washington, D.C.

Steven H. Brose, with whom Steven Reed and Cynthia L. Quarterman, Washington, D.C., were on the brief, for intervenor Trans Alaska Pipeline System (TAPS Carriers).

O. Yale Lewis, Jr. and Richard A. Curtin, Seattle, Wash., entered appearances, for intervenor Petro Star Inc.

Before WILLIAMS, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The Trans Alaska Pipeline System stretches 800 miles across the Alaskan wilderness from the vast North Slope oil field to the all-weather port of Valdez on the southern coast of the State. Built by a consortium of oil companies and opened in 1977, the pipeline currently transports nearly two million barrels of oil per day.

We will assume familiarity with the pipeline's extensive history recounted in the opinions cited in the margin.[1] Originally

---

1. *See Arctic Slope Regional Corp. v. FERC*, 832 F.2d 158 (D.C.Cir.1987), *cert. denied*, 488 U.S. 868, 109 S.Ct. 175, 102 L.Ed.2d 145 (1988); *Exxon Pipeline Co. v. United States*, 725 F.2d 1467 (D.C.Cir.1984); *Wilderness Soc'y v. Morton*, 479 F.2d 842 (D.C.Cir.) (en banc), *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).

projected to cost one billion dollars, the pipeline wound up costing more than $9 billion. The Interstate Commerce Commission (replaced in late 1977 by the Federal Energy Regulatory Commission) instituted a massive initial rate-making investigation. The main participants were the oil companies who own and operate the pipeline and the State of Alaska, which is interested in maintaining low oil transportation rates because its substantial royalties and tax revenues from the pipeline are calculated on a "netback" basis. In 1985, facing the prospect of many years of additional litigation and a record already filling some 150,000 pages, Alaska and the pipeline owners reached a comprehensive private settlement. The centerpiece of the agreement consisted of the "TAPS Settlement Methodology," a rate-setting mechanism designed to determine pipeline rates through the year 2011. The Commission, in a decision this court sustained, approved the settlement. *Arctic Slope Regional Corp. v. FERC*, 832 F.2d 158 (D.C.Cir.1987), *cert. denied*, 488 U.S. 868, 109 S.Ct. 175, 102 L.Ed.2d 145 (1988).

The dispute before us today began in December 1989, when the pipeline owners filed their proposed 1990 tariffs. These rates were substantially higher than those sought for previous years, in part because they included $120 million in costs associated with the repair of corrosion damage to the pipeline. Alaska protested the inclusion of these costs, charging that they

were incurred as the result of "imprudence" on the part of the pipeline owners. The Commission instituted a formal investigation and allowed Alaska to intervene pursuant to 18 C.F.R. § 385.214. *Amerada Hess Pipeline Corp.*, 49 F.E.R.C. ¶ 62,320 (1989). Petro Star Inc., a pipeline shipper, also intervened in the rate challenge.[2]

Several months later, the pipeline owners moved for "partial summary disposition" before the presiding Administrative Law Judge. *See* 18 C.F.R. § 385.217. The owners argued that the 1985 agreement, which by its terms settled "all outstanding issues of dispute" between the parties, Settlement Agreement § I–1 (June 28, 1985), precluded the State from objecting to the owners' including in their rates any costs stemming from imprudent actions taken before January 1, 1985, the effective date of the releases contained in the settlement. Alaska responded that the corrosion problems were not an issue of dispute in the original rate proceeding, and thus were not covered by the settlement. The Administrative Law Judge, finding the owners' characterization of the agreement to be supported by undisputed material facts, granted their motion. *Amerada Hess Pipeline Corp.*, 51 F.E.R.C. ¶ 63,004 (1990). The Commission affirmed, *Amerada Hess Pipeline Corp.*, 53 F.E.R.C. ¶ 61,061 (1990), and Alaska sought immediate review in this court.[3] The pipeline owners intervened to defend the Commission's ruling.[4]

*See also Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978).

2. The pipeline owners' proposed 1991 and 1992 tariffs included another $297 million in corrosion repair costs. Alaska filed a timely protest to each rate proposal, and in each case the Commission instituted an investigation, consolidated it with its 1990 tariff investigation, and granted Alaska's motion to intervene. *See Amerada Hess Pipeline Corp.*, 57 F.E.R.C. ¶ 62,274 (1991); *Amerada Hess Pipeline Corp.*, 53 F.E.R.C. ¶ 62,285 (1990).

3. At the same time, the Commission held that Petro Star could challenge pre-settlement imprudence because it was not a party to the settlement. *See* 53 F.E.R.C. at 61,195–96. The pipeline owners filed a petition for review of this portion of the Commission order, *Amerada*

*Hess Pipeline Corp. v. FERC*, No. 91–1086 (D.C.Cir.), which has been held in abeyance pending settlement negotiations between Petro Star and the owners. The Commission has approved a private settlement between those parties. *See Amerada Hess Pipeline Corp.*, 58 F.E.R.C. ¶ 61,173 (1992).

4. During the pendency of this petition for review, Alaska and the owners have pursued a private resolution of the corrosion costs issue through alternative dispute resolution. The ADR agreement allowed Alaska to pursue this petition, but this fact cannot, of course, affect our jurisdiction. *See Amerada Hess Pipeline Corp.*, 53 F.E.R.C. ¶ 61,266 (1990). The Commission has suspended its investigation into the 1990–92 tariffs through February 1993, while the ADR proceeds. *Amerada Hess Pipeline Corp.*, 58 F.E.R.C. ¶ 61,175 (1992).

■ We do not reach the merits. Under 28 U.S.C. § 2342(5), we would have jurisdiction only if the Commission's decision constituted a "final order." *Cf. American Train Dispatchers Ass'n v. ICC*, 949 F.2d 413, 414 (D.C.Cir.1991). "A 'final order' is one that imposes an obligation, denies a right, or fixes some legal relationship, usually at the consummation of an administrative process." *Honicker v. Nuclear Regulatory Comm'n*, 590 F.2d 1207, 1209 (D.C.Cir.1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 374 (1979).

The rate-making is a proceeding between the Commission as regulator, *see* 42 U.S.C. §§ 7155, 7172(b), and the pipeline owners whose interstate rates are within the Commission's regulatory authority. Alaska's nominal status is as an intervenor "directly affected by the outcome of the proceeding." 18 C.F.R. § 385.214(b)(2)(ii); *see* 49 F.E.R.C. at 63,465. The Commission's ruling limits Alaska's intervention to the portion of the rate challenge focusing on allegations of post-settlement imprudence.

■ In *Public Service Commission of New York v. Federal Power Commission*, 284 F.2d 200, 204 (D.C.Cir.1960), we held that complete denial of intervention in a Federal Power Commission proceeding constituted a final order appealable under 15 U.S.C. § 717r(b). Our opinion contained a "Cf." citation to *Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad*, 331 U.S. 519, 524, 67 S.Ct. 1387, 1389, 91 L.Ed. 1646 (1947), in which the Supreme Court ruled that an order denying intervention as of right in a case before a district court was subject to interlocutory appeal. 284 F.2d at 204 n. 6. The theory underlying both decisions is the same. From the movant's viewpoint, the order denying intervention represents the end of the line. Having failed to achieve the status of a party to the litigation, the putative intervenor could not later seek review of the final judgment on the merits. Yet unlike permissive intervention, which implies that the movant would not be prejudiced or legally bound by the final judgment, intervention as of right signifies that the movant would suffer harm from an adverse decision on

the merits. *See Railroad Trainmen*, 331 U.S. at 524, 67 S.Ct. at 1389–90; *Public Serv. Comm'n of N.Y.*, 284 F.2d at 204. *Cf. Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949); Rule 24(a), Fed. R.Civ.P.

Limitations on the scope of intervention are treated differently. *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 377–78, 107 S.Ct. 1177, 1182–83, 94 L.Ed.2d 389 (1987), held that an order allowing intervention, subject to certain conditions, in district court proceedings was not a final order for the purpose of appellate jurisdiction. So long as the restrictions on the intervenor's participation did not interfere with the party's "ability to raise its claims on postjudgment appeal," 480 U.S. at 378, 107 S.Ct. at 1183, the rationale for allowing immediate interlocutory appeal did not apply. Similar reasoning underlies the holding in *Natural Resources Defense Council, Inc. v. Nuclear Regulatory Comm'n*, 680 F.2d 810, 816 (D.C.Cir.1982), that a Commission order limiting the arguments a party could make was not an appealable final order.

Here the Commission's order does not preclude Alaska from bringing a petition for review to challenge any past or future Commission ruling after the Commission has reached a decision definitively imposing an obligation, denying a right, or fixing a legal relationship. Final Commission orders may be appealed by "[a]ny party aggrieved." 28 U.S.C. § 2344. We have routinely interpreted this phrase to allow petitions by parties who were intervenors before the Commission and who would suffer injury-in-fact from its final disposition. *See, e.g., Maine Pub. Serv. Co. v. FERC*, 964 F.2d 5 (D.C.Cir.1992); *Town of Norwood, Mass. v. FERC*, 962 F.2d 20 (D.C.Cir. 1992). *See also Arctic Slope*, 832 F.2d at 163 n. 10.

■ What we have written thus far is sufficient to explain why the Commission's decision placing limitations on the actions Alaska may take as an intervenor in the tariff proceeding is not an appealable final order. However, the parties have treated

the Commission's order as akin to a grant of partial summary judgment. Even if this description were accurate, it would not transform the Commission's action into a final order. In the civil context, grants of partial summary judgment are generally considered interlocutory orders, not subject to immediate review. *See Liberty Mut. Ins. Co. v. Wetzel,* 424 U.S. 737, 744, 96 S.Ct. 1202, 1206, 47 L.Ed.2d 435 (1976). The reasons are familiar. Future developments at the trial may fully satisfy the party seeking to prosecute the interlocutory appeal, thus rendering the appeal moot or insignificant and, in either case, a waste of judicial time and effort. *See, e.g., Clark v. Kraftco Corp.,* 447 F.2d 933, 936 (2d Cir.1971). Interlocutory appeals often result in delaying the final outcome and, just as often, needlessly intrude on the district court's conduct of the litigation. It is therefore usually preferable to require the parties to wait for appellate review until the lawsuit is ultimately resolved—to insist on the standard of one case, one appeal. This is as desirable in cases coming from the administrative agencies as it is in cases from the district courts. *See, e.g., Ciba–Geigy Corp. v. EPA,* 801 F.2d 430, 436 (D.C.Cir.1986); *Papago Tribal Util. Auth. v. FERC,* 628 F.2d 235, 240 (D.C.Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980).[5] Exceptions are sometimes made, usually by rule or statute, when a party will irreparably lose important rights unless an immediate appeal is permitted; or when the matter decided is clearly separate from the balance of the lawsuit and there would be no advantage in postponing review; or when an interlocutory appeal will materially advance ultimate termination of the litigation. *See* Rule 54(b), Fed.R.Civ.P.; 28 U.S.C. §§ 1292(a) & (b).

We can see no basis for an exception in this case.[6] None is created by statute. If anything, the Administrative Procedure Act is against Alaska's position. The second sentence of section 10(c) states that "A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. The provision was inserted in order to negate any inference that non-final orders would be immediately reviewable when later review is adequate and available. *See* ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 103 (1947). Moreover, as the Commission and pipeline owners observe, further proceedings before the agency may satisfy Alaska completely if it turns out that all of the challenged expenses resulted from post-settlement imprudence, such as failure properly to maintain the corrosion prevention system. All parties agree that such a ruling would preclude the owners from including the repair costs in their 1990–92 rates, and thus would have the practical effect of mooting this petition. Alaska's counter-argument is that if it cannot bring its claim before the court at this time, it may never get a chance because the Commission could drop its investigation at some future date. *Cf. Papago Tribal Util. Auth.,* 628 F.2d at 240. As the State points out, there is dicta in *National Railroad Passenger Corp. v. National Ass'n of Railroad Passengers,* 414 U.S. 453, 462 n. 9, 94 S.Ct. 690, 695 n. 9, 38 L.Ed.2d 646 (1974), seeming to suggest that agency decisions to terminate ongoing investigations are shielded from judicial review. *See Arctic Slope,* 832 F.2d at 165 & n. 15. *Compare City of Chicago v. United States,* 396 U.S. 162, 90 S.Ct. 309, 24 L.Ed.2d 340 (1969); 5 U.S.C. § 704. Whether the dicta would apply when the agency orders its investigation halted part-

---

5. The Commission analogizes its procedure for summary disposition to Rule 56 summary judgment practice in the federal district courts. *See, e.g., Tennessee Gas Pipeline Co.,* 41 F.E.R.C. ¶ 63,006, at 65,008 (1987); *Coastal States Marketing, Inc. v. Texas–New Mexico Pipeline Co.,* 25 F.E.R.C. ¶ 61,164, at 61,452 (1983). *See also Citizens for Allegan County, Inc. v. Federal Power Comm'n,* 414 F.2d 1125, 1128 (D.C.Cir.1969).

6. This court's discussion of an analogous issue in *InverWorld, Ltd. v. Commissioner of Internal Revenue,* 979 F.2d 868, 871–75 (D.C.Cir.1992) is not to the contrary; the case involved an unresolved claim entirely separate from (and thus not able to provide the same relief sought by) the claim subject to appeal.

ly on the basis of an alleged misinterpretation of a settlement agreement is an open question, a question we should not decide merely based on speculation about what the Commission might do. The State has offered nothing to indicate that an order dropping the investigation is at all likely. At this stage, it is enough to say that the State's view of the issue raised by *National Railroad Passenger,* particularly in light of *City of Chicago, Arctic Slope,* and *Farmers Union Central Exchange, Inc. v. FERC,* 734 F.2d 1486 (D.C.Cir.), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984), is far from settled. That the State may conceive of a procedural bar to review of a possible future Commission disposition is not enough to justify a clear divergence from the dictates of our finality rules.

Citing *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), Alaska asks us to take a more "flexible view of finality" (387 U.S. at 150, 87 S.Ct. at 1516). *Abbott Laboratories* upheld pre-enforcement judicial review of final agency regulations. The statement just quoted dealt with ripeness, that is, the "fitness of the issues for judicial decision." 387 U.S. at 149, 87 S.Ct. at 1515. As one of the reasons in favor of finding the issues "ripe," the Court mentioned that "further administrative proceedings are [not] contemplated." *Id.* As we have indicated, that is not the situation here. Alaska believes our immediate resolution of the contract interpretation question would assist the parties in their on-going settlement negotiations. To use that prospect as a rationale for relaxing the requirement of finality would be tantamount to abandoning altogether the restriction on judicial review of interlocutory agency orders. In any proceeding before any agency, immediate judicial review of a host of disputed legal and factual matters would doubtless narrow the dispute, aid the parties in forming realistic assessments of the strength of their positions, and thereby assist the settlement process. But the resultant flood of interlocutory appeals would do much more harm than good to the cause of the expeditious resolution of disputes. We are, in short, unconvinced that allowing judicial review of the sort of agency order placed before us in this case "will not disrupt the orderly process of adjudication." *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970).

Alaska's remaining complaint is that the Commission only raised the finality issue in its brief, filed some 21 months after Alaska filed its petition for review, although our Local Rule 7(i) provides that all motions "which, if granted, would dispose of the appeal or petition for review in its entirety" must be filed within 45 days of the docketing of a case. *See* D.C.Cir.R. 7(i). Alaska does not explain how a local rule can preclude a party from raising a jurisdictional issue at any point during the proceeding. In any event, the rule deals with motions. It does not forbid parties from raising dispositive arguments in their briefs even though those briefs typically will be filed outside the 45–day period.

We hold that we are without jurisdiction to consider Alaska's petition for review, which is accordingly dismissed without prejudice to the rights of any party to raise the substantive issues presented upon petition from a final Commission order.